IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION

```
TRACEY MCCALL, as             )
administratrix of the         )
estate of Jonathan McCall,    )
                              )
     Plaintiff,               )
                              )    CIVIL ACTION NO.
     v.                       )    1:11cv559-MHT
                              )        (WO)
HOUSTON COUNTY, et al.,       )
                              )
     Defendants.              )
```

OPINION

As administratrix of the estate of decedent Jonathan McCall, plaintiff names the following remaining defendants in her wrongful-death lawsuit: Houston County, Alabama; Houston County Jail Administrator Keith Reed; Corrections Deputy James West; and Licensed Practical Nurse Ashley Kennedy. Plaintiff administratrix asserts that the defendants' conduct caused the death of her brother in violation of the Fourteenth Amendment (as enforced through 42 U.S.C. § 1983) and the State of Alabama's wrongful-death statute, 1975 Ala. Code § 6-5-410. She also alleges violations of Title II of

the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq., and § 504 of the Rehabilitation Act, 29 U.S.C. § 794.   Jurisdiction is proper under 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights), and 1367 (supplemental jurisdiction).

This cause is before the court on cross-motions for summary judgment.  For the reasons that follow, plaintiff administratrix's motion will be denied and the defendants' motion will be granted in part and denied in part.

## I. SUMMARY-JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   The court must view the

admissible evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

## II. BACKGROUND

This case arises from the death of Jonathan McCall, an inmate at the Houston County Jail, on July 13, 2009. The medical cause of death was cecal volvulus, a twisting of part of the large intestine that can cause obstruction, pain, and, if untreated, ultimately death. <u>See</u> Evans Rpt. (Doc. No. 87-1) at 3-4.  Except where noted, the facts in this case are undisputed.

### A. Events Preceding July 13

McCall suffered from serious mental illness for years prior to his death.  At various times he had been diagnosed with schizophrenia, bipolar disorder, and schizoaffective disorder.  <u>See</u> Silberberg Rpt. (Doc. No.

87-1) at 55.   After being discharged from the Army because of his mental illness, he cycled between his mother's house, mental hospitals, treatment centers, and the Houston County Jail.

Upon a petition from his sister (plaintiff administratrix in this case), McCall was involuntarily committed in March of 2009.   He went to live at a facility operated by SpectraCare, an organization that provides mental-health treatment.   On April 28, he called 911 and threatened to harm himself or others.   He was arrested for terrorist threats, and transported to the Houston County Jail.

When he arrived at the jail, McCall was screened for medical issues.   He reported suicide attempts or ideation, that he was currently taking medication, and that he had recently been hospitalized or treated by a doctor.   Despite a jail policy requiring a referral to jail medical staff as soon as possible based on his positive response to the suicide question, McCall was not

4

assessed by medical staff or a psychiatrist on this basis. Indeed, the jail had no psychiatrist at all during McCall's incarceration at the jail in 2009, the former jail psychiatrist having recently quit.

SpectraCare personnel continued to meet regularly with McCall while he was at the jail. A case manager met with him frequently during May and June, and on July 9. A SpectraCare physician wrote McCall additional prescriptions on May 27, apparently without examining McCall. Jail personnel were aware of SpectraCare's continuing contact with McCall. A judge also ordered a psychological evaluation to determine whether McCall was fit to be released. The evaluation was scheduled for July 14, the day after he died.

After his death, staff at the jail reported that McCall often had exhibited strange behaviors. Among those reported were rocking back and forth, pacing, arguing with himself, spending time naked in his cell, urinating on himself, masturbating in his cell, putting

toilet paper in his mouth, and licking a glass window. On June 15, Physician's Assistant Jason Smoak, the director of the Houston County Jail's clinic, assessed McCall because of his behavior. Smoak noted no medical issues.

On June 28, officers noticed that McCall was acting more strangely than usual. He was unresponsive and lying on the floor, rocking back and forth, and moaning. He was also lightly hitting his head against the floor. Officers called the medical unit to ask for someone to come check McCall, but no medical personnel came.

Later that day, Nurse Kennedy came to the N-Pod, where McCall was housed, to drop off medications for the inmates; she did not examine McCall. At that time, corrections officers administered medications to inmates in the N-Pod, while nurses administered medications to inmates in the rest of the jail. This arrangement was a time-saving measure. The jail has since revised its

policy to require nurses to administer medications in the N-Pod as well.

One of the corrections officers, Kelly Landreau, attempted to give the pills to McCall, but he was unresponsive. Landreau then found Kennedy at another pod and asked her to check on McCall. Kennedy refused, saying that McCall was crazy and "I can't fix crazy." Kennedy Dep. (Doc. No. 90-30) at 127.[1]

Sometime later that evening, Kennedy overheard Landreau and another officer discussing the fact that no medical personnel ever checked on McCall. Kennedy reiterated that there was nothing she could do for McCall. She then spoke to Landreau's supervising sergeant about the matter. The sergeant called Landreau and said that Kennedy had spoken to her about the overheard conversation and that McCall was crazy and

---

1. There is conflicting evidence as to the wording of this statement. The officer remembered her words as: "I'm not messing with him. He's crazy. There's no cure for crazy." Landreau Dep. (Doc. No. 90-32) at 37. The court does not consider the difference material.

7

"insanity never killed anyone." Landreau Dep. (Doc. No. 90-32) at 47.   There is no record that jail medical personnel ever examined McCall from that day until the day he died, nearly two weeks later.

On July 7, the jail pharmacy ran out of Risperidone, an antipsychotic medication that McCall was prescribed daily.   McCall complained about not receiving his medication, and officers recorded various problems of the following days: he was not coming out of his cell, complained of inability to sleep, and stated that he believed the Nazis were after him and something was being added to his water.   McCall did not receive any Risperidone for seven days, from July 7 until his death. According to plaintiff administratrix's medical expert, this is a very long time for an individual with McCall's mental illness to go without antipsychotic medication. See Silberberg Rpt. (Doc. No. 87-1) at 60.   The actual amount of time McCall went without his medication may have been longer, as the record indicates that the

8

medical unit did not keep reliable records of when prisoners took their pills and when they did not.

According to Nurse Kennedy, sometime around July 9 she saw McCall in a visitation room. He smiled and waived at her, and she waived back. She did not observe any signs of physical distress or any indication he needed medical care. Kennedy Aff. (Doc. No. 90-22) at ¶ 35.[2]

On July 11, Physician's Assistant Smoak ordered that another drug, Trazadone, be substituted for the Risperidone. Smoak had no legal authority to make this substitution. See Smoak Dep. (Doc. No. 90-36) at 117. Furthermore, Trazadone is not a proper substitute for

_____

2. The plaintiff objects to this portion of Kennedy's affidavit as self-serving, speculative, hearsay, and lacking personal knowledge. At summary judgment, the court may consider evidence that is admissible or reducible to admissible form. Rowell v. BellSouth Corp., 433 F.3d 794, 800 (11th Cir. 2005). The first objection is not a basis for exclusion of evidence. See Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 53 (1st Cir. 2000). The remaining objections are unfounded as to Kennedy's observations and interpretations as set forth above, and are overruled as well.

Risperidone; rather, it can exacerbate psychosis or instigate a manic phase for a bi-polar patient. <u>See</u> Silberberg Rpt. (Doc. No. 87-1) at 59. It can also exacerbate constipation, and may have contributed to McCall's cecal volvulus. <u>See</u> Smoak Dep. (Doc. No. 90-36) at 49, 115.

The same day, two days before his death, McCall apparently asked to see a nurse, and an officer relayed the request to the medical unit. Bozswana Int. (Doc. No. 90-28) at 174.[3] There is no record that anyone from the medical unit came to see McCall.

_____

3.   The Houston County Sheriff's Department, in the course of its investigation of this matter, recorded and transcribed a number of interviews. <u>See</u> Alabama Bureau of Investigation Report (Doc. No. 90-28). The interviews are not sworn. However, no party has objected to the court's consideration of the transcribed interviews at summary judgment. <u>Cf.</u> <u>Nelson v. Greater Gadsden Hous. Auth.</u>, 802 F.2d 405, 408 (11th Cir. 1986) (citing <u>Davis v. Howard</u>, 561 F.2d 565, 570 (5th Cir. 1977)) ("we have upheld summary judgment where material introduced pursuant to that motion was uncertified, or otherwise inadmissible, and yet unchallenged")). Indeed, both parties cite to the interviews. Without making any finding as to their ultimate admissibility, the court will consider them at this stage.

## B. Events of July 13, 2009

On the day that McCall died, Officer West and Officer Ronnie Dye worked the first shift, from 7:00 a.m. to 3:00 p.m., covering the N-Pod.  West encountered McCall first that day, between 7:00 a.m. and 7:15 a.m., while counting prisoners and checking that all cell doors were locked. He saw McCall naked on the floor of his cell, face down, in a liquid that West believed might have been urine. The door to McCall's cell was closed, and so West could not hear any sounds McCall may have been making. Visually, he concluded that McCall did not appear to be in pain and was a healthy color.  West moved on and completed his prisoner count.  He informed Officer Dye of the situation.  There was no record from the previous shift concerning behavior by McCall.

Officers West and Dye next encountered McCall together between 7:45 a.m. and 9:00 a.m., while passing out the prisoners' medications.[4]  The officers entered the

_____

4. In all of his statements, West says he was present
(continued...)

cell this time.  McCall was still on the floor, he was naked and sprawled out on his stomach, and Dye was able to determine by smell that the liquid he was lying in was urine.  McCall was shivering and moaning.  Officer Dye offered McCall his medication, but McCall was unresponsive.  The officers agreed that the medical unit needed to examine McCall.  West Aff. (Doc. No. 90-17) at 9.[5]

---

4. (...continued)
for this interaction. In his statements, Dye does not mention West's presence, but also does not deny it.  The court concludes there is no genuine dispute on this issue: West was present

5. Plaintiff administratrix objects to this paragraph of West's affidavit, arguing that the statement is hearsay and lacks a basis in personal knowledge.  If the conversation took place, West surely has personal knowledge of what was said.  As to the hearsay objection, while these statements would be hearsay if offered to prove the truth of the matter asserted, namely that McCall did need medical care, they are not hearsay if offered for another purpose, such as establishing West's state of mind or knowledge.  Fed. R. Evid. 801.  As to any such other purpose, plaintiff administratrix's objection is overruled.  At summary judgment, the court may consider evidence that is admissible or reducible to admissible form.  Rowell, 433 F.3d at 800.

Dye contacted the sergeant supervising their shift at this point and reported that McCall was unresponsive and lying in his urine.  The sergeant responded that McCall would be given a shower later in the day.  West was aware of Dye's report to the sergeant and the sergeant's response.[6]

According to Dye, he also called the medical unit around this time and spoke to Nurse Kennedy.  Dye Aff. (Doc. No. 86-2) at 2.  He states that he told her that McCall was lying in his urine, unresponsive, and moaning. He also states he told her someone from the medical unit needed to come down to examine McCall.[7]  Kennedy states

---

6. See West Aff. (Doc. No. 90-17) at 10; West Int. (Doc. No. 90-28) at 78.  There is no evidence to dispute West's knowledge of this conversation, although again Dye's statements do not mention it.

7. The defendants object to this portion of Dye's affidavit, arguing that it contradicts his prior Sheriff's Department interview, in which he described calling the medical unit only in the afternoon.  In that interview, he stated that Kennedy answered and that Dye told her that he needed to speak with Physician's Assistant Smoak but "didn't tell her what it was about." Dye Int. (Doc. No. 90-28) at 25.  The court may disregard
(continued...)

that she spoke to Dye about McCall only once that day and

that their conversation was non-substantive.   Kennedy

---

7. (...continued)
a subsequent affidavit that directly contradicts sworn
deposition testimony.  See Hadley v. Gutierrez, 526 F.3d
1324, 1330 (11th Cir. 2008); Clay v. Equifax, Inc., 762
F.2d 952, 960 n.5 (11th Cir. 1985); Van T. Junkins &
Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657
(11th Cir. 1984) ("When a party has given clear answers
to unambiguous questions which negate the existence of
any genuine issue of material fact, that party cannot
thereafter create such an issue with an affidavit that
merely contradicts, without explanation, previously given
clear testimony.").  Here, the prior statement was not a
deposition under oath, but an unsworn interview subject
only to a Garrity notice.  See Garrity v. State of N.J.,
385 U.S. 493, 494 (1967) (holding that, absent waiver,
incriminating statements by law-enforcement officers
facing termination for remaining silent are not
voluntary).  An investigatory interview, even with a
Garrity notice, is very different from a deposition,
which is sworn under oath.  But the court need not reach
the question of whether it may reject Dye's affidavit
based on the prior interview, because in any event it
would not do so in this case.  The affidavit does not
contradict any clear answers to unambiguous questions in
the interview.  In the interview, Dye describes only a
single call to the medical unit, in the afternoon.  But
no question was asked, and no answer given, about any
other calls Dye may have made to the medical unit in the
morning.  While Dye's failure to mention an earlier call
in which he discussed the matter with Kennedy may be
raised to attack his credibility on cross-examination at
trial, his silence in the interview is not a sufficient
basis to disregard the affidavit at summary judgment.
Therefore, the objection is overruled.

14

Aff. (Doc. No. 22) at 10; Kennedy Int. (Doc. No. 90-28) at 115.[8]

Officer West visually checked on McCall periodically during the day and saw him in generally the same position. Officer Dye again entered McCall's cell around noon. Dye was passing out the lunch trays in the N-Pod, and West was not present. At this point, McCall's feet

---

8. Plaintiff administratrix objects to this portion of Kennedy's affidavit on the grounds that it constitutes hearsay and contradicts Dye's testimony. If offered for some purpose other than the truth of the matter, such as to establish Kennedy's lack of knowledge of McCall's condition, the evidence is admissible. See supra note 5. Furthermore, while the court may reject a witness's affidavit if it directly contradicts that same witness's prior deposition testimony, see supra note 7, the same is not true of the affidavit that merely contradicts another witness's deposition. To reject an affidavit on the latter basis would amount to nothing more than the judgment that one witness is credible and the other is not; it is elementary that such determinations are inappropriate at summary judgment. See Moorman v. UnumProvident Corp., 464 F.3d 1260, 1266 n.1 (11th Cir. 2006). Plaintiff administratrix's objection is overruled. Finally, the court notes that Kennedy stated in her deposition that "I remember speaking to Dye and him telling me kind of what was going on." Kennedy Dep. (Doc. No. 90-30) at 136. This statement arguably contradicts her later affidavit, in which she described the call as non-substantive, but is too ambiguous to justify disregarding the affidavit at summary judgment.

were on the ground and he was leaning much of his weight
onto the metal bunk.   Dye asked if McCall wanted lunch,
and McCall again groaned incoherently.   Dye left the food
tray and later returned to find McCall had not eaten
anything.   As West was preparing to take his break, Dye
told him that he intended to call Physician's Assistant
Smoak because the situation was not good and someone from
the medical unit needed to see McCall.

Dye called the medical unit and spoke to Nurse
Kennedy.[9]   He asked to speak with Smoak.   Dye told Smoak
that McCall was naked, had been lying in his urine, and
now was leaning across his bunk.   Dye expressed concern
because McCall was on psychiatric medication.   Smoak
asked Kennedy to confirm that McCall had been taking his
medications and was scheduled to meet with a psychiatrist
the following day, which she did.   According to Smoak,
nothing Dye told him indicated that McCall was having a
medical, rather than psychiatric, problem.

_____

9. According to Kennedy, this was their only phone
conversation that day.

Although the supervising sergeant initially had told Dye and West that McCall would be given a shower later that day, the sergeant later determined that the jail was too busy that day and McCall would instead be showered and his cell cleaned the following day.  The officers noted in a log book that McCall was lying naked in his cell and would be showered on the following day.

Other officers took over for the second shift at 3:00 p.m.  Dye informed them of McCall's behavior, that he had alerted the medical unit, and that McCall would be cleaned the following day.  At 4:36, one of the second-shift officers contacted the medical unit and entered McCall's cell because some of the other inmates had said he did not look right.  McCall was unresponsive and not breathing.  Nurse Kennedy arrived, entered the cell, checked for a pulse, and started CPR.  This was the first medical attention McCall received that day.  Paramedics were called and took McCall to the hospital.  Efforts to revive him ceased later that evening.

17

Cecal volvulus, the intestinal twisting from which McCall died, is an extremely painful condition.  It takes hours or days to develop, and most cases are treated because that extended time period is so painful.  Thus, death due to this condition is very uncommon among healthy young people.  <u>See</u> Evans Report (Doc. No. 87-1) at 90.  In the opinion of plaintiff administratrix's medical expert, had McCall been sent to the hospital at the time of the previous call or calls to the medical unit that day, he would have been appropriately treated and most likely would have made a full recovery.  <u>Id</u>.

## III. DISCUSSION

Plaintiff administratrix asserts the following claims: (1) a claim under the Fourteenth Amendment (as enforced through 42 U.S.C. § 1983) against Officer West, Nurse Kennedy, Administrator Reed, and Houston County; (2) claims under the Americans with Disabilities Act and § 504 of the Rehabilitation Act against Houston County;

18

and (3) a claim under Alabama's wrongful-death statute against West, Kennedy, and Reed.

Plaintiff administratrix seeks partial summary judgment as to the liability of West and Kennedy under the Fourteenth Amendment. She does not seek summary judgment against the other defendants or as to the other counts. The defendants seek summary judgment on all claims. They argue that (1) none of the defendants violated McCall's Fourteenth Amendment rights, and in any event the individual defendants are entitled to qualified immunity; (2) there is no basis for relief under the ADA or Rehabilitation Act; and (3) the individual defendants are entitled to immunity from the state-law claim under 1975 Ala. Code § 14-6-1 and Alabama state-agent immunity.


## A. Fourteenth Amendment

The Eighth Amendment prohibits "cruel and unusual punishments," U.S. Const. Amend. VIII, including deliberate indifference to the medical needs of inmates.

19

<u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976).  While the Eighth Amendment does not technically apply prior to conviction, the Fourteenth Amendment applies an "identical" deliberate-indifference standard for the treatment of pretrial detainees such as McCall.  <u>Goebert v. Lee Cnty.</u>, 510 F.3d 1312, 1326 (11th Cir. 2007).  To establish deliberate indifference, a plaintiff must show (1) "that [he] had a serious medical need"; (2)  "that the prison official acted with deliberate indifference to [his] serious medical need"; and (3) that there is causation.  <u>Id</u>.  The first prong is objective, in the sense that it looks to the inmate's actual medical condition; the second is subjective, in the sense that it looks to the official's state of mind.

There appears to be no dispute that McCall has established the first, objective prong.  "A medical need that is serious enough to satisfy the objective component is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even

a lay person would easily recognize the necessity for a doctor's attention." Id. (internal quotations omitted). "In the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition." Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1307 (11th Cir. 2009). Certainly under the latter, if not the former, definition, McCall's need was serious.

The second, subjective prong of the test, deliberate indifference, requires "'(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence.'" Goebert, 510 F.3d at 1327 (quoting Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005)) (alteration in original). "Proof of deliberate indifference requires a great deal more than does proof of negligence: 'To be deliberately indifferent a prison official must know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of

serious harm exists, and he must also draw the inference.'" <u>Goodman v. Kimbrough</u>, 718 F.3d 1325, 1331-32 (11th Cir. 2013) (quoting <u>Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga</u>, 400 F.3d 1313, 1319-20 (11th Cir. 2005)) (emphasis and internal quotations omitted).

"As such, imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. Each individual Defendant must be judged separately and on the basis of what that person knows." <u>Burnette v. Taylor</u>, 533 F.3d 1325, 1331 (11th Cir. 2008) (citations omitted). The court will thus examine each defendant individually as to the subjective prong.

### i. Officer West

Both plaintiff administratrix and Officer West seek summary judgment regarding Officer West's liability under the Fourteenth Amendment. The relevant facts are not in

dispute.  The court will grant summary judgment in favor of West.

The first issue is whether West had a subjective knowledge of a risk of serious harm.  Goebert, 510 F.3d at 1327.  The court concludes that he did.  West was aware that McCall was having some kind of problem on July 13.  He observed McCall several times throughout the day, naked, on the floor, lying in his own urine.  He heard him moaning and was aware that he did not respond to anything that was said to him all day, did not eat, and did not take his medication.  Although he had observed McCall behaving strangely in the past due to his mental illness, West viewed McCall's actions on that day as strange even for him.  West Dep. (Doc. No. 90-34) at 22. West recognized that there was a medical problem, one that he believed required an examination by medical staff, although not one he thought at the time constituted an emergency.  West Dep. (Doc. No. 90-34) at 25; West Aff. (Doc. No. 90-17) at 9.  Based on this

undisputed evidence, West was subjectively aware of a risk of serious harm.

The next question is whether West disregarded that risk by conduct that is more than gross negligence. Goebert, 510 F.3d at 1327. "'[O]fficials, to be liable [for deliberate indifference], must be aware of a substantial risk of serious harm to the inmates and not take reasonable measures to alleviate that risk.'" Harper v. Lawrence Cnty., Ala., 592 F.3d 1227, 1235 (11th Cir. 2010) (quoting Marsh v. Butler Cnty., Ala., 268 F.3d 1014, 1027 (11th Cir. 2001)). "'Deliberate indifference' can include 'the delay of treatment for obviously serious conditions where it is apparent that delay would detrimentally exacerbate the medical problem, the delay does seriously exacerbate the medical problem, and the delay is medically unjustified.'" Id. (quoting Taylor v. Adams, 221 F.3d 1254, 1259-60 (11th Cir.2000)).

To establish that Officer West disregarded a known risk, plaintiff administratrix cites Officer Dye's

statement that, despite being in regular contact with McCall throughout the day, West "never did anything about it" and "never reported the situation with McCall." Dye Aff. (Doc. No. 86-2) at 3. However, it is undisputed that West was aware that Dye, his partner, had both reported McCall's situation to his superior officers and had made at least one call to the medical unit. In the court's view, whether West made reports himself or was simply aware that the reports had been made by another corrections officer is not a material difference.

The question with regard to West is, therefore, this: was the fact that the officers' concerns had been reported to their supervisors and to medical personnel sufficient to absolve West of deliberate indifference? Or, despite the officers having reported their concerns, did West have some further obligation to act, for example by taking McCall to the medical unit without being instructed to do so. As is illustrated by a pair of Eleventh Circuit Court of Appeals cases from 2010,

reporting medical concerns may or may not be enough to avoid deliberate-indifference liability, depending on the circumstances.

In Harper, the Eleventh Circuit found that the plaintiff had sufficiently alleged deliberate indifference to survive a motion to dismiss. 592 F.3d at 1235. The jailers in that case were aware that the prisoner was hallucinating, slurring his words, physically weak, and incoherent and had urinated on himself. Id. at 1234. The jailers had informed the arresting officer of the prisoner's condition, and the officer had said he would contact the chief of police and that the officer, the chief, and the town would make a decision regarding medical care for the prisoner. The jailers also notified another jailer of the circumstances during a shift change. However, as the Eleventh Circuit noted, "neither [jailer] took any steps to actually secure immediate medical attention for [the prisoner], whose need for prompt treatment appeared dire." Id. at

1235.  These allegations, the court found, were sufficient to support a violation of the Fourteenth Amendment.

By contrast, in Townsend v. Jefferson Cnty., 601 F.3d 1152, 1159 (11th Cir. 2010), the Eleventh Circuit found that jailers were entitled to qualified immunity because there was no violation of the inmate's rights.  In that case, the prisoner, who was pregnant at the time, offered evidence that she had contacted jailers many times over the course of a 12-hour period because she was bleeding from her vagina.  Id. at 1154-55.  Eventually the prisoner was seen by a nurse, who briefly examined her and determined that further examination was necessary but that there was no emergency.  Id. at 1155.  The prisoner continued to seek help from the jailers, but no nurse returned until after she had miscarried.  Id. at 1155-56.  The court concluded that, "Both deputies were aware that [the nurse] had determined [the prisoner's] condition was not an emergency."  Id. at 1158.  Because the plaintiff

27

had not "presented evidence that her situation was so obviously dire that two lay deputies must have known that a medical professional had grossly misjudged [the prisoner's] condition," the court concluded that no reasonable jury could find that they knew the situation was an emergency. <u>Id</u>.

This case is somewhere in between <u>Harper</u> and <u>Townsend</u>. Officers West and Dye did more than the jailers in <u>Harper</u>, in alerting their supervisor and the medical unit that there was a problem rather than just telling individuals who were several steps removed from the provision of actual medical care. But unlike <u>Townsend</u>, they cannot rely on an assessment by Nurse Kennedy or Physician's Assistant Smoak, as neither actually examined McCall that day.

There is another aspect of the situation that mitigates West's liability. It is apparently undisputed that the jail's policy was that jailers could not unilaterally bring inmates to the medical unit except in

an emergency.[10]   Rather, they needed to wait for the
medical unit to call and ask for an inmate to be brought
up.   In the case of an emergency, officers could call
911.   According to West, while he believed McCall needed
medical attention, he did not believe the situation was
an emergency.   West. Aff. (Doc. No. 90-17) at 10.

The limits of an individual officer's authority are
relevant to the determination of whether he acted with
deliberate indifference.   "There can be no duty, the
breach of which is actionable, to do that which is beyond
the power, authority, or means of the charged party.
Those whose callous indifference results in liability are
those under a duty-possessed of authority and means-to
prevent the injury." <u>Williams v. Bennett</u>, 689 F.2d 1370,

---

10. Various affidavits offered by the defendants
state that officers could transport inmates to the
medical unit if "necessary."   It is unclear what that
statement means; does necessary just mean in the case of
an emergency?   In any event, plaintiff administratrix's
view is that officers were not allowed to transport
inmates absent an emergency; as the court is considering
the facts in the light most favorable to plaintiff
administratrix in addressing the defendants' motion, it
will take this view as well.

1384 (11th Cir. 1982).   In this case, given his assessment that there was no emergency, West's discretion was limited: he was not permitted to take McCall to the medical unit without authorization.

West surely could have done more.   He could have called the medical unit again (despite knowing that Dye already had) and insisted that someone come down.   He could have called 911. In this sense, the court agrees with plaintiff administratrix's expert: McCall's behavior "should have caused alarm and prompted immediate corrective action" beyond "merely calling persons on the telephone or merely passing on information to supervisors and making notations in logs."   Aiken Rpt. (Doc. No. 87-1) at 25.

But the court is convinced that, with the evidence considered in the light most favorable to plaintiff administratrix, West's conduct does not rise to the level of deliberate indifference.   Rather, his failure to do more appears to be a combination of a misappraisal of the

situation, in that he believed there was a medical problem but no emergency, along with dedication to following protocol and being satisfied with notifying other authorities.  That West was wrong, and was perhaps negligent, is insufficient to show deliberate indifference.  <u>Goebert</u>, 510 F.3d at 1327 (conduct must be constitute more than gross negligence).  West and Dye did <u>something</u> to try to aid McCall: they alerted the medical unit and their supervisor.  While that might be insufficient under other circumstances, for example if McCall was visibly bleeding to death on the ground, in this case his symptoms were more ambiguous as to the urgency of the situation; it was somewhat difficult to tell where mental illness ended and physical illness began.  The court need not, and does not, reach the question of whether West's conduct was simply <u>negligent</u>.  But, given what West knew, on this undisputed record, he was not deliberately indifferent.[11]

_____

11. Plaintiff administratrix also seems to argue, in
(continued...)

## ii. Nurse Kennedy

Both plaintiff administratrix and Nurse Kennedy also seek summary judgment regarding Kennedy's liability under the Fourteenth Amendment.  Here, factual disputes preclude summary judgment in favor of either party.

---

11. (...continued)
the alternative, that West was deliberately indifferent from the time he first saw McCall that day to the time that he became aware Dye had informed the medical unit and the supervising sergeant.  In other words, plaintiff administratrix argues that, even if West can claim 'credit' for Dye's actions, that does not excuse West's inaction in the morning.  The problem is twofold: first, the undisputed record establishes that West had significantly less information before he and Dye entered McCall's cell around 9:00 a.m.  He did previously look into the closed cell around 7:00 a.m., but all he saw was that McCall was naked, face down, on the floor, in a liquid which might, or might not, have been urine.  He did not, for example, know that McCall was groaning, uncommunicative, and refusing to eat or take medicine. What West knew is not sufficient, against the backdrop of McCall's prior behavior, to establish West's subjective knowledge of a risk of serious harm.  <u>Goebert</u>, 510 F.3d at 1327.  Second, even if West was deliberately indifferent, the record does not establish causation. <u>See</u> <u>id</u>. at 1326.  For the steps he arguably should have taken, namely contacting the medical unit and alerting his supervisor, actually <u>were</u> taken later that morning by Dye; because Dye's warnings were ignored, McCall still died.  Thus even if West were deliberately indifferent from 7:00 a.m. to 9:00 a.m., that deliberate indifference did not cause McCall's death.

The core dispute regarding Nurse Kennedy is what, if anything, she knew of McCall's condition on July 13. In first considering plaintiff administratrix's motion, the court takes the evidence in the light most favorable to Kennedy. In this light, she knew next to nothing. She received only one call from Officer Dye, who simply asked her to be connected to Physician's Assistant Smoak. Smoak, in turn, asked Kennedy to confirm that McCall had a psychiatrist appointment the following day, but did not tell her the substance of Dye's description of McCall's state. On this view of the evidence, Kennedy knew nothing about McCall's condition on July 13, and so could not have been deliberately indifferent to it.

In arguing that Kennedy was deliberately indifferent plaintiff administratrix also relies on Kennedy's earlier interactions with McCall. In particular, she argues that Kennedy ignored officers' requests that she check McCall on June 28, explaining that "I can't fix crazy." Kennedy Dep. (Doc. No. 90-30) at 127. This constituted

33

deliberate indifference, plaintiff administratrix argues,
not to McCall's then-unknown medical problem but to his
known psychiatric problem.

Again with the facts considered in the light most
favorable Kennedy, the June 28 incident also fails to
establish deliberate indifference.  According to Kennedy,
on June 28 she was told only that McCall was "not acting
right," "crawling around his cell," and might need his
medications adjusted.  Kennedy Aff. (Doc. No. 90-22) at
8.  She claims not to have received other information,
such as whether he was hitting his head on the floor or
refusing food or medications.  Id.  She considered the
behaviors she was told about to be within the realm of
McCall's 'normal' activities.  While she noted in her log
that Smoak should see McCall the next day, she did not
evaluate him herself because she believed his conduct
arose from mental illness and there was nothing she could
do about his mental illness.  Id. at 9.  When she went to
deliver medications to the officers, she saw McCall from

the control booth and nothing appeared to be wrong.  Id.
The officers who had reported the problem earlier said he
was fine.  Id.

On these facts, Kennedy was not deliberately
indifferent.  Again, based on this limited knowledge, it
was at worst negligent of her not to examine McCall
herself on June 28.  But she referred the issue to her
superior and followed up with the officers.  A reasonable
jury could conclude that her comment, "I can't fix
crazy," Kennedy Dep. (Doc. No. 90-30) at 127, was nothing
more that an insensitive way of expressing the limits of
her medical abilities.

Viewed in the light most favorable to plaintiff
administratrix on the issue of whether summary judgment
should be entered in favor of Nurse Kennedy on the
Fourteenth Amendment claim, the facts regarding Nurse
Kennedy look quite different.  According to Officer Dye,
he called Kennedy in the morning on July 13 and told her
that McCall was lying in his urine, unresponsive, and

35

moaning.  He told her someone from the medical unit
needed to come down to examine McCall.  Kennedy never
came to examine McCall until she was called by the
second-shift officers, some eight hours later, at which
point he was near death.

Viewed in the light most favorable to plaintiff
administratrix, the prior June 28 incident takes on a
significantly different meaning as well.  From this
viewpoint, it appears Officer Landreau and his partner
called the medical unit at least once and spoke to
Kennedy once in person.  In each instance they indicated
that medical personnel should evaluate McCall.  Contrary
to Kennedy's statement, Landreau's deposition does not
indicate that he told her everything was fine.  On the
contrary, a fair reading of his deposition and interview
is that Landreau sought out Kennedy specifically to
reiterate that someone needed to see McCall because he
was not fine, and it was in this context that she said
she could do nothing because McCall was crazy.

This interaction provides a telling context for the events of July 13, one from which a jury could easily infer that Kennedy ignored Dye's warnings, just as she ignored Landreau's warnings, because, according to Kennedy, McCall was crazy and "I can't fix crazy." Kennedy Dep. (Doc. No. 90-30) at 127.  In other words, a jury could conclude that Kennedy had decided to ignore all concerns regarding McCall because of his mental illness.  Cf. Fielder v. Bosshard, 590 F.2d 105, 107-08 (5th Cir. 1979) ("Although these comments ... do not in themselves establish cruel and unusual punishment, they reflect the appellants' attitudes. When considered in conjunction with the events leading up to [the] death, these statements tend to show that the appellants were not merely unmindful or negligent prison officials.").

On that version of events, Kennedy's conduct could be viewed to reflect deliberate indifference.  Indeed, the situation is reminiscent of Carswell v. Bay Cnty., 854 F.2d 454, 457 (11th Cir. 1988), relied on by plaintiff

37

administratrix.    In  that  case,  the  Eleventh  Circuit
upheld  a  jury  verdict  of  deliberate  indifference  against
a  physician's  assistant  working  at  the  jail.    The  court
cited  evidence  that  two  members  of  the  jail's  staff
notified  the  physician's  assistant  of  the  inmate's
serious  condition  and  that  the  physician's  assistant
ignored  those  warnings.    Similarly,  here,  the  evidence
taken  in  the  light  most  favorable  to  plaintiff
administratrix  indicates  that  Kennedy  ignored  several
warnings  on  multiple  days  about  McCall's  medical
condition,  including  information  that  he  was  moaning
naked  in  his  own  urine.    This  would  constitute  deliberate
indifference.

Nurse  Kennedy  also  seeks  summary  judgment  based  on
qualified  immunity.    "The  doctrine  of  qualified  immunity
protects  government  officials  'from  liability  for  civil
damages  insofar  as  their  conduct  does  not  violate  clearly
established  statutory  or  constitutional  rights  of  which
a  reasonable  person  would  have  known.'"    Pearson  v.

Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

The initial burden is on Kennedy to establish that she was acting within the scope of her discretionary authority. Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002). Plaintiff administratrix argues that Kennedy has failed to meet that burden. The law is that, "A government official proves that he acted within the purview of his discretionary authority by showing objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." Hutton v. Strickland, 919 F.2d 1531, 1537 (11th Cir. 1990) (internal quotation marks omitted). The actions and omissions with which plaintiff administratrix charges Kennedy in this case clearly fall within this definition. The court finds she was acting within her discretionary authority.

Next, in deciding whether an official is entitled to this immunity, courts analyze (1) whether the plaintiff has shown an actual violation of the right at issue and (2), if so, whether the right was clearly established at the time it was violated.  <u>Pearson</u>, 555 U.S. at 232. Because the court has already found that, with the facts viewed in the light most favorable plaintiff administratrix, the evidence is sufficient to support a finding that Kennedy violated McCall's Fourteenth Amendment right, the court will address only whether that right was clearly established.

"Qualified immunity protects government officials, in their individual capacities, from suit unless the law preexisting the defendant official's supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances." <u>Pace v. Capobianco</u>, 283 F.3d

1275, 1282 (11th Cir. 2002).  As this court has explained, "The requirement that a right be clearly established] is fundamentally a question of fair notice: If the law does not make the officer aware that his 'conduct would be clearly unlawful,' then he is protected by qualified immunity, <u>Saucier v. Katz</u>, 533 U.S. 194, 202 (2001); however, if the plaintiff can show that 'a materially similar case has already been decided' in his favor, then fair notice exists and qualified immunity does not attach. <u>Mercado v. City of Orlando</u>, 407 F.3d 1152. 1159 (11th Cir. 2005)." <u>Schultz v. City of Brundidge</u>, 2012 WL 705358 at *5 (M.D. Ala. 2012) (Thompson, J.).

As discussed above, <u>Carswell</u> is materially similar to the instant case.  There, as here, a medical professional was notified of serious problems by correctional officers, and there, as here, the medical professional ignored those warnings.  The court finds that <u>Carswell</u>

provided ample notice to Kennedy that her conduct would violate McCall's constitutional rights.

Nurse Kennedy is not entitled to summary judgment on the Fourteenth Amendment claim.


### iii. Administrator Reed

The court next turns to the claim against Administrator Reed under the Fourteenth Amendment as enforced through 42 U.S.C. § 1983. Theories of vicarious responsibility, such as respondeat superior, are not available in § 1983 actions. Goebert, 510 F.3d at 1331. Rather, "Supervisory liability lies where the defendant personally participates in the unconstitutional conduct or there is a causal connection between such conduct and the defendant's actions." Harper v. Lawrence Cnty., Ala., 592 F.3d 1227, 1236 (11th Cir. 2010). It is undisputed that Reed had no personal involvement with McCall. Thus, to establish to required causal connection, plaintiff administratrix must show that

(1) "a history of widespread abuse put[] the [Reed] on notice of the need to correct the alleged deprivation, and he fail[ed] to do so"; (2) that Reed's "custom or policy ... result[ed] in deliberate indifference to constitutional rights"; or (3) that "facts support an inference that the [Reed] directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Id. (alteration in original, internal quotation marks omitted). The standard by which Reed may be "held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003) (internal quotation marks omitted).

Plaintiff administratrix's principal theory of liability as to Reed relies on the second type of casual connection, namely one in which the supervisor's custom or policy results in deliberate indifference. She argues that Reed had the following policies which resulted in

**43**

deliberate indifference: (1) policy of officers rather than nurses dispensing medications in the N-pod; (2) policy of requiring written request for medical treatment; (3) policy of understaffing N-pod; (4) policy of not accommodating mentally ill inmates; (5) policy of inadequately administering drugs, particularly because of flawed documentation; (6) custom of failing to train and supervise medical staff; and (7) custom and policy of not allowing officers to move inmates to the medical unit.

Reed argues that he had the authority only to implement policy, not the authority to create it. The latter power, he argues, is vested in the sheriff alone. See 1975 Ala. Code § 14-6-1 ("The sheriff has the legal custody and charge of the jail in his or her county and all prisoners committed thereto....").

Plaintiff administratrix argues that Reed is the policymaker, and cites Reed's deposition testimony for the proposition that he was responsible for changes to policy. That testimony does not support that position.

Reed in fact states that, while he makes changes to policies, he "make[s] sure [the Sheriff] approves of them." Reed Dep. (Doc. No. 90-27) at 48-9; see also id. at 48 ("Q: But you adopted [the policies] and implemented them or re-implemented them when you came on. Is that right? A: The sheriff did."). Plaintiff administratrix points to no other evidence indicating that any policy is attributable to Reed as opposed to the sheriff. In other words, the undisputed evidence is that the sheriff makes policy, not Reed. As such, Reed cannot be held liable in his supervisory capacity for the results of those policies.

In the alternative, citing Greason v. Kemp, 891 F.2d 829, 836 (11th Cir. 1990), plaintiff administratrix argues that Reed is liable for failing to train and supervise others. The law is that, "A supervisory official is not liable under section 1983 for an injury resulting from his failure to train subordinates unless his 'failure to train amounts to deliberate indifference

**45**

to the rights of persons with whom the subordinates come into contact' and the failure has actually caused the injury of which the plaintiff complains." Belcher v. City of Foley, Ala., 30 F.3d 1390, 1397 (11th Cir. 1994) (quoting Popham v. City of Talladega, 908 F.2d 1561, 1564-65 (11th Cir. 1990)). Again, deliberate indifference is a stringent standard: "Failure to train can amount to deliberate indifference when the need for more or different training is obvious, such as when there exists a history of abuse by subordinates that has put the supervisor on notice of the need for corrective measures, Greason, 891 F.2d at 837, and when the failure to train is likely to result in the violation of a constitutional right." Id. at 1397-98 (citations omitted). The standard is the same for failure to supervise.

Plaintiff administratrix argues that Reed failed to train personnel adequately to handle mentally ill inmates and failed to supervise the medical staff. However, she

points to no evidence that Reed was aware that jail
personnel were ignoring prisoners' medical conditions
because they did not know how to handle mental illness
and no evidence that Reed was aware that medical-unit
personnel were failing to respond to requests to examine
prisoners or inaccurately recording medication records.
She has also failed to point to a history of such
conduct.  <u>Cf</u>. <u>Greason</u>, 891 F.2d at 837 (finding failure
to train and supervise where defendants were aware of the
underlying problems and did nothing to address them).  On
these facts, the need for training to avoid this kind of
harm was not obvious.  <u>Belcher</u>, 30 F.3d at 1397.

It is clear that a great number of things went wrong
in the jail with regard to McCall.  The policies were
problematic, the staff's attitude was inappropriate, and
the failure to respond to his medical condition was
inexcusable.  But plaintiff administratrix has pointed to
no evidence tying any of that to wrongdoing by Reed.  To
hold him accountable without evidence of his own

**47**

wrongdoing would be to impose respondeat superior liability, which the court may not do.

Reed is entitled to summary judgment on the Fourteenth Amendment claim.


iv. Houston County

Finally, plaintiff administratrix has sued Houston County for a violation of the Fourteenth Amendment as enforced through 42 U.S.C. § 1983.  Counties may be sued under § 1983, but may not be held liable under a theory of respondeat superior.  McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004).  "'It is only when the execution of the government's policy or custom ... [inflicts] the injury that the [county] may be held liable.'" Id. (quoting City of Canton v. Harris, 489 U.S. 378, 385 (1989)).  Thus, "to impose § 1983 liability on a [county], plaintiff [administratrix] must show: (1) that [a] constitutional right[ was] violated; (2) that the [county] had a custom or policy that constituted

**48**

deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." Id. Plaintiff administratrix argues that Houston County is liable for its policy of delaying the hiring of a jail psychiatrist and for its policy of inadequate funding for the jail.

Houston County argues that it is entitled to summary judgment because responsibility for the welfare of inmates is vested solely in the sheriff, a state official by Alabama law, for "Alabama counties have no duties with respect to the daily operation of the county jails and no authority to dictate how the jails are run." Turquitt v. Jefferson Cnty., Ala., 137 F.3d 1285, 1291 (11th Cir. 1998) (en banc). As such, the county "cannot be liable for the harms that befall jail inmates due to improper operation of the jail or negligent supervision of its inmates." Id. However, as the Eleventh Circuit recognized in Turquitt, counties do have a role in funding. See id. at 1289 ("The duties of the counties

with respect to the jails 'are limited to funding the operation of the jail and to providing facilities to house the jail.'") (quoting <u>Stark v. Madison County</u>, 678 So.2d 787, 787 (Ala. Civ. App. 1996)).  Indeed, Alabama law provides that, "Necessary clothing and bedding must be furnished by the sheriff or jailer, <u>at the expense of the county</u>, to those prisoners who are unable to provide them for themselves, and also <u>necessary medicines and medical attention</u> to those who are sick or injured, when they are unable to provide them for themselves."  1975 Ala. Code § 14-6-19 (emphasis added).  Thus the policy plaintiff administratrix alleges, of underfunding, appears to be one that Houston County could be held liable for under some circumstances.

However, <u>McDowell</u>, on which plaintiff administratrix relies, precludes liability in this case.  In <u>McDowell</u>, the inmate was having problems walking and urinating and jail staff ordered a transport to take him to the hospital.  His case was incorrectly thought not to be an

emergency and other inmates had injuries which required
immediate care, so his transportation was delayed for
over a day.  As a result, he was left partially
paralyzed.  There, as here, the plaintiff alleged county
liability based on a policy of inadequate funding,
pointing to the unavailability of additional
transportation.

The Eleventh Circuit found that the county could not
be held liable in that case, and all three reasons the
court gave apply to this case as well.  First, the court
in McDowell found that the plaintiff had failed to show
a specific policy of "understaffing the Jail so as to
delay the transfer of inmates."  McDowell, 392 F.3d at
1291.  While the plaintiff in that case, like plaintiff
administratrix here, had offered generalized evidence
that, "despite Sheriff's Office requests for additional
personnel, other priorities often took precedent," such
evidence was insufficient without a showing that the jail

"consistently failed" to transport individuals such as the plaintiff to the hospital.  <u>Id</u>. at 1290.

In this case, plaintiff administratrix has offered evidence that the jail was underfunded and that Houston County knew of the underfunding.  But she has offered no evidence that incidents such as this one were widespread; on the contrary, plaintiff administratrix has pointed to no similar incidents of a medical condition being ignored because of mental illness.  "Simply put, this isolated incident, however unfortunate, does not demonstrate evidence of the County's 'persistent' or 'widespread' policy."  <u>Id</u>. at 1290-1.

Second, the Eleventh Circuit rejected the plaintiff's claim in <u>McDowell</u> because he failed to show that "the [county's] action was 'taken with the requisite degree of culpability, ... with deliberate indifference to its known or obvious consequences.'"  <u>Id</u>. at 1291 (quoting <u>Davis ex rel. Doe v. Dekalb County Sch. Dist.</u>, 233 F.3d 1367, 1375-76 (11th Cir. 2000)).  It is not

enough, the court made clear, to point to "a generalized policy of understaffing." <u>Id</u>.  Instead, the county "must have a 'deliberate intent' to inadequately staff."  <u>Id</u>. (citation omitted).  In order to carry this burden in a case in which the challenged policy is facially valid, the plaintiff must "establish that a reasonable member of the Board would conclude that the County's budget decisions <u>would lead to events that occurred here</u>."  <u>Id</u>. at 1292 (emphasis added).

In this case, plaintiff administratrix has offered no evidence at all that "a reasonable member of the [Houston County] Board would conclude that the [county's] budget decisions would lead to events that occurred here."  <u>Id</u>. Indeed, it is hard to imagine how she could do so.  Given the unusual circumstances of this case, with a serious but treatable physical illness 'masked' by serious mental illness, it seems implausible that plaintiff administratrix could come forward with proof that the county should have expected the events that occurred.

"The alleged constitutional violation here was not a 'highly predictable consequence' of the [county's] failure to budget (and hence, adequately staff) the Sheriff's Office." McDowell, 392 F.3d at 1292.

Finally, the Eleventh Circuit found that the plaintiff had failed to establish causation in McDowell. "A plaintiff must prove causation by demonstrating that the [county's] deliberate conduct ... was the moving force behind [the] injury...." Id. (internal quotation marks and emphasis omitted). It is insufficient to show that, but for the budget decision, the violation would not have occurred or to show that the budget decision made a violation more likely. Id. Instead, courts must "look to whether a complete review of the budget decision (and the resulting understaffed Jail) reveals that the [county board members] should have known that [the] injuries were a plainly obvious consequence of that decision." Id. (internal quotation marks omitted). The court found that there was no such causal connection in

54

McDowell.  For the reasons described above, this court concludes likewise as to the instant case.

Two of the cases on which plaintiff administratrix relies to establish Houston County's liability are inapposite.  In Moore v. Morgan, 922 F.2d 1553, 1555 (11th Cir. 1991), the only issue presented was the county's failure to address known unconstitutional overcrowding; the plaintiff's deliberate-indifference claim was not at issue on appeal.  If a county is aware of unconstitutional overcrowding, and does not authorize funding to increase housing for prisoners, then obviously it should know that unconstitutional overcrowding will continue.  Similarly, in Marsh v. Butler Cnty., Ala., 268 F.3d 1014, 1026 n.6 (11th Cir. 2001), the Eleventh Circuit addressed claims against the county based only on the physical condition of the jail.  These cases shed little light on the analysis for a funding argument in the context of deliberate indifference and certainly do

not offer reason to doubt the teachings of <u>McDowell</u>, a deliberate-indifference case.

A third case on which plaintiff administratrix relies, <u>Anderson v. City of Atlanta</u>, 778 F.2d 678, 685 (11th Cir. 1985), is more relevant to this case. However, <u>Anderson</u> is importantly distinguishable from both this case and <u>McDowell</u>.  In <u>Anderson</u>, a detainee had died during the night at a jail.  The evidence indicated that the jailers knew he was intoxicated and that he had asked for medical attention, but that no medical personnel had seen him and the jailers had not checked in on him during the night as frequently as their policy required.  A jury found that none of the individual officers was liable, but held the City of Atlanta (as well as the director of the City's Bureau of Corrections) liable for a deliberately indifferent policy and practice.  The district court entered judgment notwithstanding verdict for the defendants, and the

Eleventh Circuit reversed and reinstated the jury's verdict (with an exception not relevant here).

In analyzing the case, the court was clear in Anderson, as it later was in McDowell, that proof of only an "isolated event" would be insufficient to establish liability for a county or city. Anderson, 778 F.2d at 685. However, the difference in Anderson was that the plaintiffs had offered ample evidence on each of the issues about which the plaintiff in McDowell had failed to carry his burden of proof. In Anderson, nearly every witness had testified that the jail was chronically understaffed. Corrections officers were unable to check on inmates because they were "off doing someone else's job," id. at 682, and required medical personal had simply not been hired. Id. at 684. Furthermore, there was sufficient evidence to establish that the city knew that its understaffing would prevent officers from doing their jobs properly. Id. at 686. In other words, it was entirely foreseeable that the policy of underfunding

would lead to exactly the kind of situation before the court in that case.  Finally, there was a clear causal connection: Anderson had died because no nurse evaluated him and because corrections officers did not look in on him frequently enough, or, in other words, <u>because</u> of the city's underfunding.  This conclusion was underscored by the jury's decision not to impose liability on any individual officer, presumably because the jury blamed the city's policy rather than the individual officers' conduct: "The jury could reasonably find that a policy of understaffing resulted in the unavailability of medical personnel and prevented individual officers from being able to do their tasks properly."  <u>Id</u>. at 686.

Thus, as they pertain to this case, <u>Anderson</u> and <u>McDowell</u> do not differ in the legal standards applied, but only in the evidence presented to carry the plaintiff's burden.  Like <u>McDowell</u>, and unlike <u>Anderson</u>, plaintiff administratrix in this case has failed to offer sufficient evidence to establish that Houston County's

58

policy of underfunding violated McCall's constitutional rights. Therefore, summary judgment will be entered in favor of Houston County on the Fourteenth Amendment claim.


## B. ADA and Rehabilitation Act

Plaintiff administratrix asserts that Houston County violated the ADA (42 U.S.C. § 12131 et seq.) and § 504 of the Rehabilitation Act (29 U.S.C. § 794). The county seeks summary judgment as to these claims, arguing that there was no discrimination based on disability and that, in any case, the county is not the proper defendant for such claims.

Title II of the ADA prohibits public entities, including local governments, from excluding from participation, denying benefits to, or discriminating against individuals with disabilities by reason of those disabilities. 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act imposes parallel restrictions on local

governments that receive federal financial assistance. 29 U.S.C. § 794.

"In order to state a Title II claim, a plaintiff generally must prove (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." Bircoll v. Miami-Dade Cnty., 480 F.3d 1072, 1083 (11th Cir. 2007). The standard is the same under § 504. See Cash v. Smith, 231 F.3d 1301, 1305 n. 2 (11th Cir. 2000) ("Cases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice-versa.").

Plaintiff administratrix argues that McCall was a qualified individual with a disability, namely his mental illness. She argues that the county excluded, denied benefits to, and discriminated against McCall by failing

to fund staff and medical care adequately, and in particular by failing to hire a psychiatrist for six months. Finally, she argues this was on account of his disability, pointing to staff members' lack of understanding of mental illness.

These claims fail. As noted above, under Alabama law the county is responsible for funding but not for the actual provision of medical care or oversight of staff. See Turquitt, 137 F.3d at 1291. Thus lack of funding alone must be the basis of these claims. But that means that plaintiff administratrix must show the lack of funding was "by reason of" McCall's disability. There is simply no evidence that the county failed to fund a psychiatrist or other staff in a discriminatory manner. See Merker v. Miami-Dade Cnty. Fla., 485 F. Supp. 2d 1349, 1356 (S.D. Fla. 2007) (Seitz, J.) ("Claims for compensatory damages under Title II of the ADA ... require a showing that the defendant intentionally discriminated or acted with bad faith.") (citing Wood v.

President & Trustees of Spring Hill College, 978 F.2d
1214, 1219 (11th Cir. 1992)).

The court will grant summary judgment Houston County
on the ADA and Rehabilitation Act claims.


### C. Alabama Wrongful-Death Statute

Finally, plaintiff administratrix asserts violations
of Alabama's wrongful-death statute, 1975 Ala. Code
§ 6-5-410, against individual Officer West, Nurse
Kennedy, and Administrator Reed.   Section 6-5-410
provides a cause of action for death resulting from a
defendant's "'wrongful act, omission, or negligence.'"
Ex parte Rodgers, --- So.3d ---, 2013 WL 1277130 (Ala.
2013) (quoting 1975 Ala. Code § 6-5-410(a)).   West,
Kennedy, and Reed have not argued that they are entitled
to summary judgment on the merits of this claim, that is,
that plaintiff administratrix failed to offer sufficient
evidence to establish a wrongful-death claim.   Rather,
they seek summary judgment based only on immunity:

specifically, statutory immunity (1975 Ala. Code § 14-6-1) and Alabama common-law state-agent immunity.

### i. Statutory Immunity

West, Kennedy, and Reed invoke the recently amended 1975 Ala. Code § 14-6-1. Under Alabama law, the sheriff is a state executive officer and enjoys absolute immunity. Ex parte Shelley, 53 So. 3d 887, 891 (Ala. 2009). The Alabama Supreme Court ruled in 2009 that the sheriff's absolute immunity under the Alabama Constitution did not extend to employees of the sheriff other than deputies. Id. at 897. In 2011, the Alabama legislature amended § 14-6-1, which now provides:

> "The sheriff may employ persons to carry out his or her duty to operate the jail and supervise the inmates housed therein for whose acts he or she is civilly responsible. Persons so employed by the sheriff shall be acting for and under the direction and supervision of the sheriff and shall be entitled to the same immunities and legal protections granted to the sheriff under the general laws and the Constitution of Alabama of 1901, as long as such persons are acting

> within the line and scope of their
> duties and are acting in compliance with
> the law."

1975 Ala. Code § 14-6-1 (emphasis added).  West, Kennedy,

and Reed argue that they are rendered immune by the new

provisions.   Plaintiff administratrix counters that

amended § 14-6-1 does not apply to conduct that took

place before it was enacted.  In this case, the events at

issue took place in 2009, before the statute was amended.

The Eleventh Circuit has resolved this issue since

the parties submitted summary-judgment briefing.   The

Eleventh Circuit initially certified to the Alabama

Supreme Court the question of whether § 14-6-1 applies

retroactively.  Johnson v. Conner, 720 F.3d 1311, 1316

(11th Cir. 2013).  However, the Alabama Supreme Court

declined to address the issue.  Johnson v. Conner, ---

F.3d ---, 2014 WL 2619687 at *1 n.1 (11th Cir. 2014).

The Eleventh Circuit then examined the matter itself and

concluded that "amended § 14-6-1 does not apply

retroactively."  Id. at *2.  Therefore, the appellate

**64**

court found that it "must apply the statute in effect when the injury occurred." Id. Accordingly, this court will apply the law in effect at the time of the injury in this case, and, accordingly, concludes that the statute does not provide absolute immunity for Officer West, Nurse Kennedy, and Administrator Reed. Shelley, 53 So. 3d at 897.

### ii. Common-Law Immunity

Alternatively, Officer West, Nurse Kennedy, and Administrator Reed argue that they are entitled to common-law state-agent immunity from the state-law claim. In Ex parte Butts, 775 So. 2d 173, 177-78 (Ala. 2000), the Alabama Supreme Court adopted a restatement of state-agent immunity, first articulated by the plurality in Ex parte Cranman, 792 So.2d 392 (Ala.2000), as follows, in part:

> "A State agent shall be immune from
> civil liability in his or her personal
> capacity when the conduct made the basis

> of the claim against the agent is based
> upon the agent's ....
>
> (2) exercising his or her judgment in
> the administration of a department or
> agency of government ...
>
> (4) exercising judgment in the
> enforcement of the criminal laws of the
> State ..."

Id. at 177-78 (quoting Cranman, 792 So.2d 392, 405
(plurality opinion)).  The court also recognized certain
exceptions to, or limitations on, this immunity as
follows, in part:

> "[However,] a State agent shall not be
> immune from civil liability in his or
> her personal capacity
>
> (1) when the Constitution or laws of the
> United States, or the Constitution of
> this State, or laws, rules, or
> regulations of this State enacted or
> promulgated for the purpose of
> regulating the activities of a
> governmental agency require otherwise;
> or
>
> (2) when the State agent acts willfully,
> maliciously, fraudulently, in bad faith,
> beyond his or her authority, or under a
> mistaken interpretation of the law."

Id.

66

The first question is whether West, Kennedy, and Reed are state agents.  Plaintiff administratrix appears to argue that Ex parte Shelley, which held that employees of the sheriff other than deputies did not enjoy his absolute immunity, also prevents West, Kennedy, and Reed from invoking Cranman immunity.  However, this misreads Shelley, which provides:

> "'When determining whether a State interest in an action against a state official or employee in his or her individual capacity is sufficient to trigger the immunity granted by [Ala. Const.] § 14, our cases distinguish between the standards applied to those state agents or employees whose positions exist by virtue of legislative pronouncement and those who serve as the constitutional officers of this State. We have held that State-agent immunity may bar an action against a state agent or employee under the principles announced in Ex parte Cranman, 792 So.2d 392 (Ala. 2000). ... However, this Court has consistently held that a claim for monetary damages made against a constitutional officer in the officer's individual capacity is barred by State immunity whenever the acts that are the basis of the alleged liability were performed within the course and scope of the officer's employment.'"

Shelley, 53 So. 3d at 897 (quoting Ex parte Davis, 930 So.2d 497, 500-01 (Ala. 2005)).  Shelley held only that jailers were not the alter ego of the sheriff, himself a constitutional officer.  This did nothing to prevent them, as employees of the sheriff and thus of the state, from invoking Cranman.

Under the burden-shifting framework established by the Alabama Supreme Court, West, Kennedy, and Reed bear the initial burden of establishing that they were acting in a function of the type that would entitle them to state-action immunity.  See Ex parte Estate of Reynolds, 946 So.2d 450, 452 (Ala. 2006); see also Grider v. City of Auburn, 618 F.3d 1240, 1255 (11th Cir. 2010). If they make "such a showing, the burden then shifts to the plaintiff to show that [they] acted willfully, maliciously, fraudulently, in bad faith, or beyond [their] authority." Reynolds, 946 So.2d at 452.

West, Kennedy, and Reed argue for immunity under the fourth prong of Cranman, for exercising judgment in

enforcement of the criminal laws. They cite Howard v. City of Atmore, 887 So. 2d 201 (Ala. 2003), which was a wrongful-death claim based on the jailers' failure to prevent an inmate's suicide. In that case, the Alabama Supreme Court found that "the Cranman categories include the guarding of a city jail". Id. at 206.

Relying on Wilson v. Manning, 880 So. 2d 1101, 1109 (Ala. 2003), plaintiff administratrix responds that West's, Kennedy's, and Reed's conduct falls outside of Cranman. Wilson was a medical-malpractice suit brought by an inmate against the jail's director of nursing. The court found that the nurse was not immune under the second prong of Cranman. Citing 1975 Ala. Code § 14-6-19, which provides that "the sheriff or jailer" is responsible for providing "necessary medicines and medical attention," the court found that even if the nurse were exercising her discretion, she had "no discretion to decline to provide necessary medicines and

69

treatment in violation of that statute." <u>Wilson</u>, 880 So. 2d at 1109.

This court finds that <u>Wilson</u> controls this case. Both prongs (2) and (4) of <u>Cranman</u> specify situations in which agents are immune for exercising judgment. Further, 1975 Ala. Code § 14-6-19, which specifies jailers, applies to all of the individual defendants in this case. Thus the Alabama Supreme Court's view that the nurse in <u>Wilson</u> had no discretion to decline to provide necessary medical treatment applies with equal force to Nurse Kennedy and the other jail employees in this case. To that extent, <u>Howard</u>, which is about decisions made in guarding an inmate rather than decisions made with regard to medical treatment, is inapposite.

Officer West, Nurse Kennedy, and Administrator Reed are not entitled to <u>Cranman</u> immunity.

**\*\*\***

An appropriate judgment will be entered as follows: summary judgment will be entered in favor of Houston County on all claims against it, that is, claims under the Fourteenth Amendment, the ADA, and § 504 of the Rehabilitation Act; summary judgment will be entered in favor of Officer West on the Fourteenth Amendment claim; summary judgment will be entered in favor of Nurse Kennedy on no claims; and summary judgment will be entered in favor of Officer West on the Fourteenth Amendment claim.  The following claims will go to trial: the Fourteenth Amendment claim against Kennedy and the state-law wrongful-death claim against West, Kennedy and Reed.

DONE, this the 3rd day of July, 2014.

       /s/ Myron H. Thompson
     UNITED STATES DISTRICT JUDGE